# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
c/o Department of Justice
Washington, D.C. 20530,

*Plaintiff*,

Civil Action No.

v.

XCL RESOURCES HOLDINGS, LLC
600 N. Shepherd Drive
Suite 390
Houston, TX 77007

VERDUN OIL COMPANY II LLC
945 Bunker Hill Road
Suite 1300
Houston, TX 77024

and

EP ENERGY LLC
945 Bunker Hill Road
Suite 100
Houston, TX 77024

*Defendants.*

## COMPLAINT FOR CIVIL PENALTIES AND EQUITABLE RELIEF FOR VIOLATIONS OF THE HART-SCOTT-RODINO ACT

The United States of America, acting under the direction of the Attorney General of the

United States, brings this civil antitrust action for equitable and monetary relief in the form of

civil penalties against the Defendants XCL Resources Holdings, LLC ("XCL"),Verdun Oil

Company II, LLC ("Verdun"), and EP Energy LLC ("EP"), and alleges:

## NATURE OF THE ACTION

1.      This case involves violations of federal antitrust obligations under Section 7A of the Clayton Act, 15 U.S.C. §18A, commonly known as the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"). Under the HSR Act, both parties must make a pre-merger notification filing to the federal antitrust agencies and observe the corresponding waiting-period obligations before transferring any ownership or control of the to-be-acquired business to the acquirer. This waiting period ensures that the parties to a proposed transaction remain as separate, independent entities during the pendency of the antitrust review. This suspensory waiting period allows the enforcement agencies the opportunity to investigate the transaction and, where applicable, pursue an enforcement action, before consolidation of the businesses and assets occurs.

2.      In this matter, Verdun and EP entered a proposed transaction that was subject to the HSR Act's notification and waiting-period requirements, and each Defendant made the required pre-merger notification filing with the antitrust agencies. The Defendants failed, however, to satisfy their waiting-period obligations. Instead, upon executing the transaction agreement, EP allowed Verdun and its sister company, XCL, to assume operational and decision-making control over significant aspects of EP's day-to-day business operations.  This was no mere technical violation; the Defendants' conduct effectively allowed one competitor to acquire beneficial ownership, including control over key competitive decisions of the other, before the transaction closed, which is precisely what the HSR Act prohibits.

3.      Pursuant to a Membership Interest Purchase Agreement dated July 26, 2021 ("Purchase Agreement"), Verdun agreed to acquire EP, a company engaged in crude oil production in the Uinta Basin area of Utah and in the Eagle Ford area of Texas. Verdun is under

common management with XCL, and both companies are engaged in crude oil production: Verdun in the Eagle Ford area and XCL in the Uinta Basin. The purchase price for the proposed transaction was approximately $1.4 billion. As part of the transaction, EP's operations in the Uinta Basin were to be transferred to XCL, and XCL would pay the portion of the purchase price attributed to the Uinta Basin assets.

4.      The proposed transaction triggered a filing obligation under the HSR Act. As such, the Defendants were required to make premerger notification filings with the Federal Trade Commission ("FTC") and Department of Justice and to observe the prescribed waiting periods before transferring ownership of EP to XCL and Verdun. The Defendants' parent entities made premerger notification filings for the Defendants' proposed transaction as required by the HSR Act. After receiving the premerger notification filings, the FTC investigated the proposed transaction and ultimately obtained a consent agreement addressing the FTC's concerns about the impact of the transaction on competition in the market for the development, production, and sale of waxy crude oil in the Uinta Basin area of Utah. The consent agreement was entered on March 25, 2022, and required the Defendants to divest all of EP's Utah operations to a qualified third-party operator, Crescent Energy, to remedy the potential lessening of competition in the alleged crude oil market.

5.      The HSR Act's waiting-period obligation for this transaction went into effect on July 26, 2021, the date the Defendants executed the Purchase Agreement, and continued through March 25, 2022, the date the FTC accepted the consent agreement and granted termination of the waiting period.

6.      For a portion of this waiting period, however, the Defendants disregarded their obligations under the HSR Act and transferred significant operational control over EP's

ordinary-course business to XCL and Verdun. This conduct violates the HSR Act and is often referred to as "gun jumping" or a "gun-jumping violation."

7.    Specifically, the Purchase Agreement provided for the immediate transfer of control over key aspects of EP's business to XCL and Verdun, including granting XCL and Verdun approval rights over EP's ongoing and planned crude oil development and production activities and many of EP's ordinary-course expenditures. Once the Purchase Agreement was signed, by virtue of these approval rights, XCL and Verdun quickly began gun jumping by exercising operating control over significant aspects of EP's business. Indeed, XCL put an immediate halt to EP's new well-drilling activities, so that XCL – not EP – could control the development and production plans for EP's drilling assets moving forward. XCL halted EP's new oil-drilling activities for several weeks, from approximately July 26, 2021, to approximately August 16, 2021. On approximately August 17, 2021, after the Defendants realized that the FTC would investigate the transaction, XCL and Verdun allowed EP to resume its own well-drilling and planning activities.

8.    The Defendants' unlawful gun jumping allowed competitors to coordinate their activities. Among other things, XCL's temporary halting of EP's development activities contributed to EP having crude oil supply shortages in September and October 2021 at a time when the United States was experiencing significant supply shortages and spiking crude oil prices due to sudden demand increases as COVID-19 restrictions eased. The Defendants anticipated EP's potential supply shortages while negotiating the Purchase Agreement, which specifically provided that XCL and Verdun – not EP – would bear all costs associated with EP's supply shortages. XCL and EP – direct competitors in the marketplace – then worked in concert to supply EP's customers in satisfaction of EP's customer supply commitments. During this

period, EP employees effectively reported to their XCL counterparts and provided XCL employees with details on customer contracts, supply volumes, and pricing terms. XCL employees also coordinated directly with EP's customers to discuss EP's supply shortage and to arrange for alternative delivery to the customer, which XCL made either from its own supplies or from purchases it made on the spot market, to fulfill EP's contractual commitments to the customers. EP's customers began contacting XCL directly – sometimes excluding EP altogether – to discuss EP's supply and delivery commitments to each customer under the relevant EP supply contract.

9.    The Purchase Agreement also required EP to submit all expenditures above $250,000 for XCL's or Verdun's review and approval. These approval requirements applied to many of EP's ordinary-course expenditures, and effectively transferred control over a significant portion of EP's day-to-day operations to XCL and Verdun. Further, XCL and Verdun received and approved expenditure requests from EP falling well below the $250,000 threshold outlined in the Purchase Agreement.

10.    XCL also required changes to certain of EP's ordinary-course business operations, such as EP's well-drilling designs and its leasing and renewal activities. EP also gave XCL almost-unfettered access to EP's competitively sensitive business information – including EP's site design plans, customer contract and pricing information, and daily supply and production reports – in the months after the parties signed the Purchase Agreement.

11.    Verdun also coordinated with EP on EP's contract negotiations with certain customers in the Eagle Ford production area. Specifically, Verdun observed that certain EP contracts included below-market prices and directed EP to raise them in the next contracting period. EP complied.

12.     The illegal conduct detailed above lasted through October 27, 2021, when the Defendants executed an amendment to the Purchase Agreement, which allowed EP to operate independently once again and in the ordinary course of business, without XCL's or Verdun's control over its day-to-day operations. Around this time, XCL and Verdun and EP also stopped coordinating on customer supply and pricing and ceased exchanging competitively sensitive information.

13.     The Defendants' transfer of operational control over key aspects of EP's business to XCL and Verdun during the HSR waiting period was a transfer of beneficial ownership that constitutes a gun-jumping violation of the HSR Act. The Defendants were in violation of the HSR Act from when the Purchase Agreement was signed, on July 26, 2021, until the Purchase Agreement was amended, on October 27, 2021, a period of 94 days.

<u>JURISDICTION, VENUE, AND INTERSTATE COMMERCE</u>

14.     The United States brings this action under Section 7A of the Clayton Act, 15 U.S.C. § 18a, to recover civil penalties for the violation of the HSR Act.

15.     This Court has jurisdiction over the subject matter of this action under Section 7A(g) of the Clayton Act, 15 U.S.C. § 18a(g), and under 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

16.     The Defendants are engaged in—and their activities described herein substantially affected—interstate commerce.

17.     The Defendants have consented to the personal jurisdiction and venue in the District of Columbia for purposes of this action.

## THE DEFENDANTS

18.     Defendant XCL Resources Holdings, LLC is a limited liability company organized, existing, and doing business under, and by virtue of, the laws of the State of Delaware, with its office and principal place of business at 600 N. Shephard Drive, Suite 390 in Houston, Texas.

19.     Defendant Verdun Oil Company II, LLC is a limited liability company organized, existing, and doing business under, and by virtue of, the laws of the State of Texas, with its office and principal place of business at 945 Bunker Hill Road, Suite 1300 in Houston, Texas.

20.     Defendant EP Energy LLC is a limited liability company organized, existing, and doing business under, and by virtue of, the laws of the State of Delaware, with its office and principal place of business at 945 Bunker Hill Road, Suite 100 in Houston, Texas.

21.     All Defendants are engaged, among other things, in the development, production, and sale of crude oil in the United States.

## THE HSR ACT AND RULES

22.     The HSR Act requires certain acquiring persons, and certain persons whose voting securities or assets are acquired, to file notifications with the Department of Justice and the FTC (collectively, the "federal antitrust agencies") and to observe a waiting period before consummating certain acquisitions of voting securities or assets. 15 U.S.C. §18a(a) and (b). Of relevance here, the notice and waiting requirements apply if, as a result of the acquisition, the acquiring person will "hold" assets or voting securities above the HSR Act's size of transaction threshold (which was $368.0 million at all times relevant to this complaint).

23.     Under the HSR Act, the FTC promulgated rules defining relevant terms and specifying what information must be included in the required notification. 16 C.F.R. §§801–803.

The rules define "hold" to mean "beneficial ownership, whether direct, or indirect through fiduciaries, agents, controlled entities or other means." 16 C.F.R. §801.1(c). While the existence of beneficial ownership will depend on the facts in a particular case, practical indicia include controlling ordinary-course business decisions, assuming or rejecting contractual obligations, obtaining competitively sensitive information, and partaking in financial gains and losses.

24.     Through the HSR Act, Congress intended to provide the federal antitrust agencies prior notice of, and information about, proposed transactions. The HSR Act created a process for premerger notification and investigation that does not require assessing beforehand whether the proposed transaction is anticompetitive or illegal under the antitrust laws. Congress created a suspensory waiting period to provide the federal antitrust agencies with the opportunity to investigate a proposed transaction and to determine whether to seek an injunction to prevent its consummation if the investigation shows that the proposed transaction may violate the antitrust laws. Gun-jumping violations deprive the enforcement agencies of this opportunity to investigate a transaction and seek an injunction before a transaction is completed, after which it may be difficult to completely restore competition and the acquired company to their pre-transaction states.

## THE PURCHASE AGREEMENT

25.     Pursuant to the Purchase Agreement, XCL and Verdun agreed to acquire EP for $1.445 billion, with possible adjustments for specified conditions. XCL and Verdun each contributed more than $368 million of the purchase price, triggering notice and waiting requirements under the HSR Act for both companies.

26.     XCL and Verdun's bid to acquire EP's business was contingent on XCL and Verdun securing immediate approval rights over EP's ordinary-course development activities;

8

the Defendants memorialized these rights in the Purchase Agreement they signed. As XCL executives noted during the Purchase Agreement negotiations, "[XCL's parent] is providing a deposit that more than offsets potential damages from 60 days of delayed production and initial operation planning, we moved materially on price and included this term in our initial offer sheet, **we are unable to move off this point**." (emphasis in original).

27.     The Purchase Agreement restricted EP's discretion to conduct its ordinary-course business activities during the period between the signing of the Purchase Agreement and the closing of the transaction, a period that included the full duration of the HSR Act's applicable waiting period.

28.     For example, EP committed "not to propose, agree to, or commence any individual operation on the Assets anticipated to cost in excess of Two Hundred Fifty Thousand ($250,000)," unless XCL or Verdun first expressly approved the activity, without any exception for ordinary-course transactions.

29.     Further, for the numerous crude oil wells EP was developing, EP would "not conduct any operation in connection with" those plans "unless such operations are expressly permitted pursuant to" the Purchase Agreement "or are otherwise approved by Purchaser."

30.     The Purchase Agreement thus prevented EP from continuing with its crude oil well-development activities without XCL's or Verdun's approval, giving XCL and Verdun control to stop or delay EP from moving forward with its production plans in the normal course of its business.

31.     XCL or Verdun had "sole discretion" whether to approve any actions that were otherwise prohibited by the Purchase Agreement, and the Purchase Agreement set forth procedures for granting XCL's or Verdun's approval.

32.     In short, these contractual provisions allowed one competitor to control the other's ordinary-course business activities relating to crude oil production before the transaction closed—a paradigmatic case of gun jumping through transfer of beneficial ownership.  All this occurred during a time when the U.S. market as a whole was facing significant supply shortages and multi-year highs in oil prices, resulting in Americans paying skyrocketing prices at the pump.

33.     The parties also agreed to shift to XCL and Verdun the financial risk for certain EP business activity, which constitutes further evidence of gun jumping. The Defendants anticipated that the Purchase Agreement restrictions on EP's activities would result in crude supply shortages for EP and its customers in the ensuing months and could cause EP to breach existing obligations. The Purchase Agreement therefore required XCL and Verdun to bear all financial risk and liabilities associated with these provisions and shifted to XCL and Verdun the financial ramifications of these changes and delays to EP's development activities. The Purchase Agreement provided that "failure of Purchaser to approve such matters shall obligate Purchaser to bear all risk and liability for any breach or non-compliance under the Assets as a result of Purchaser's acts or omissions with respect to such failure to approve."

34.     The Purchase Agreement was eventually amended on October 27, 2021. Among other things, the amendment effectively allowed EP to resume its well-development activities in the ordinary course of business without requiring XCL's or Verdun's consent.

<u>THE DEFENDANTS' UNLAWFUL CONDUCT FOLLOWING THE MERGER AGREEMENT</u>

35.     This matter presents a straightforward example of unlawful gun jumping where two companies agree to coordinate their activities before a transaction is permitted to close under

the HSR Act. The Purchase Agreement created the contractual obligation for EP to transfer operating control over key portions of its crude oil production business to XCL and Verdun, and the Defendants' actions in the weeks and months after they executed the Purchase Agreement demonstrated that such a transfer of control from EP to XCL and Verdun did indeed take place. XCL and Verdun thus gained beneficial ownership of EP's assets in direct violation of the HSR Act's waiting period requirements.

***XCL required EP to suspend its well-completion activities***:

36.     The Defendants' actions abruptly halted EP's crude oil development activities. Indeed, upon signing the Purchase Agreement, XCL immediately stopped EP's ordinary-course well-drilling design and planning activities in Utah. XCL did this so that it – not EP – could take over the management of EP's development plans and designs moving forward.

37.     An email sent the afternoon the Purchase Agreement was signed on July 26, 2021, from an EP executive to his counterparts at XCL, illustrates the Defendants' intentions to transfer operational control of EP to XCL and Verdun: "Congratulations on getting the Purchase Agreement signed and deposit sent! Now we can move forward with your requested changes. Please confirm that you approve the following: Shut down all currently planned fracs until after the close. Per the attached spreadsheet, by shutting down these fracs we have sold more oil than we will be able to deliver and XCL accepts the contractual and reputational ramifications of not delivering these barrels."

38.     XCL responded in the affirmative. "**XCL Confirmations of EP Operational Changes** . . . . **We confirm** the request to suspend any operations related to completions between sign to close." (emphasis in original).

39.     In the days after the Defendants signed the Purchase Agreement, XCL employees began actively supervising EP's well-design and planning activities, including by requiring changes to EP's site design plans and vendor-selection process. XCL employed a "boots on the ground" approach to taking over EP's operations and design planning, with EP employees effectively reporting to their XCL counterparts.

40.     For instance, in an August 2, 2021, email from an XCL Vice-President to EP's Chief Operating Officer, the XCL executive states: "Thanks for taking my call today, and working through operational planning with us. As discussed, we would like to complete the Moose Hollow and Bluebell wells as a combined team, where XCL leads on frac design and vendor selection, and EP teams with XCL to execute the operations."

41.     The Defendants understood that XCL's halting of EP's ordinary-course well-development projects would lead to, or contribute to, production shortfalls for EP and its customers in following months, given the delay in EP's ability to drill the new wells. In exchange, XCL agreed to assume the contractual and reputational ramifications of these shortfalls.

42.     The stoppages to EP's ordinary-course well-drilling activities lasted for several weeks – until approximately August 17, 2021 – and ended only after the Defendants realized that the FTC would conduct a full investigation into the competitive effects of their transaction. At that point, XCL allowed EP to resume its well-drilling activities – though EP would continue to seek XCL's review and approval for its plans and related expenditures, as required by the Purchase Agreement.

***XCL coordinated with EP on EP's customer contracts, customer relationships, and customer deliveries***:

43.     The Defendants' unlawful gun jumping delayed introduction of increased supply in the market. EP faced supply shortages in the Uinta Basin in the months of September and October 2021 due to XCL halting EP's well-completion activities in the weeks following the Purchase Agreement signing. XCL and EP discussed the shortages and XCL's resulting financial obligation during the subsequent months. For instance, in an October 2021, email exchange between EP and XCL, an EP employee wrote, "However, as XCL has been directing EP Energy's completions and has agreed to fulfill EP Energy's contractual commitments between sign and close any shortfall [in EP's ability to fulfil its supply commitments] would be due to XCL's decisions."

44.     To this end, XCL began conferring and coordinating with EP about EP's production volumes, customer contracts, and supply obligations.

45.     XCL requested and received from EP detailed information about EP's actual and projected production volumes, delivery capabilities, and customer supply obligations – including details about the customers' contracted volumes and pricing terms.

46.     XCL then proceeded to coordinate with EP to manage and direct EP's fulfillment of its contractual obligations to its customers, with XCL covering the volume shortages under EP's customer agreements.

47.     XCL also engaged directly with EP's customers about EP's supply and delivery obligations, providing EP's customers with detailed information about EP's volume projections, supply shortages, and ability to meet its supply obligations in current and future periods.

48.     XCL held itself out to EP's customers, in words or substance, as coordinating EP's supply and deliveries in the Uinta Basin, and EP's customers began contacting XCL

directly about their EP contracts, EP's volume projections, and the delivery schedules pursuant to the contracts.

49.     For example, in an email exchange between an EP customer and XCL from September 2021, the EP customer asks XCL to confirm EP's supply forecast: "It was good catching up with you this week. Below is the forecast from EP Energy. Let me know if you think they'll actually have these contracted volumes for October or if we'll need to do another spot deal similar to September." The XCL employee responded, "I do not have an updated EP forecast for October yet but am told it will come in the next day or two. Once that's in hand we'll be able to build a plan for October."

50.     Another example, from August 2021, shows an exchange between XCL and a different EP customer, where the EP customer asks XCL to provide EP's volume forecast for the following month: "Just wondering if you have a feel yet for what Sept will look like (EP volume)? Also, just to confirm, we're good with the contract volumes for Q4, correct?" The XCL employee responds, "I do have a feel for sept, we have a planning meeting in the AM to finalize, but directionally looking better than planned. Potentially no cuts, probably more likely in the 500bpd range, but will definitely get you a communication on that tomorrow once I get confirmation. As for Q4, that too is still a little up in the air as we finalize the development plan and I'll share more as soon as I can. We are planning on moving things forward to fill commitments in full, just again needing to confirm all of that."

51.     XCL coordinated with EP and EP's customers regarding EP's supply and delivery volumes from approximately August 2021 through approximately October 2021. This coordination ended by November 2021, when XCL began informing EP's customers that XCL

and EP needed to operate as independent companies for the remainder of the pre-merger period and that, as a result, XCL would no longer be covering EP's volume shortfalls.

***XCL's and Verdun's approvals were required for EP to conduct ordinary-course business activities and to make ordinary-course expenditures; XCL and Verdun required EP to make changes to its operations***:

52.     In addition to exercising their approval rights over EP's well-drilling activities, XCL and Verdun exercised their rights under the Purchase Agreement to review and approve other of EP's ordinary-course expenditures and business activities.

53.     Under the Purchase Agreement, EP needed to secure XCL's or Verdun's approval before making expenditures above $250,000, which is a relatively low threshold in the crude development and production business. As a result, XCL or Verdun approval was required before EP could perform a range of ordinary-course activities needed to conduct its business, including, *e.g.*, purchasing supplies for its drilling operations and entering or extending contracts for drilling rigs.

54.     In practice, EP sought and received approval for ordinary-course expenditures below the low levels established through the Purchase Agreement. These included approvals to purchase gauges and other pre-drilling expenses.

55.     On top of submitting its expenditures for approval, under the Purchase Agreement, EP also needed to secure XCL's or Verdun's approval for other basic activities, such as hiring field-level employees and contractors necessary to conduct its drilling and production operations in the ordinary course of business. Pursuant to these requirements, EP submitted its ordinary-course hiring proposals to XCL and Verdun for approval.

56.     XCL and Verdun also required EP to make changes to aspects of its business plans and day-to-day operations. These included changes to EP's well-drilling and site design

plans, modifications to the areas in Utah and Texas where EP could pursue leasing and renewal activities, changes regarding EP's selection of vendors, and instructions not to pursue development opportunities that EP had been exploring in the ordinary course of business.

***Verdun and EP coordinated regarding prices for EP's customers in the Eagle Ford region of Texas:***

57.     The Defendants' gun-jumping activity also included coordination of prices. In the Eagle Ford region of Texas, employees from Verdun and EP coordinated on pricing terms that EP would offer to its customers. EP shared its competitively sensitive information on customer pricing and supply volumes with Verdun, and then sought Verdun's approval of the prices it negotiated with the customers.

58.     On July 28, 2021, shortly after the Purchase Agreement was signed, a Verdun employee with responsibility for sales and marketing contacted his EP counterpart to discuss EP's customer pricing and contract terms. The Verdun employee used information he had obtained from the virtual data room set up by EP as part of the sale process to suggest changes to EP's customer pricing. An EP employee responded and continued to consult with the Verdun employee as she was negotiating with the customers. Ultimately, the EP employee sought and obtained the approval of the Verdun employee for the new contracts with EP's customers.

***EP exchanged competitively sensitive information with XCL and Verdun without adequate safeguards to limit access or prevent misuse:***

59.     The Defendants' gun jumping also facilitated the exchange of confidential and granular business information far beyond anything necessary for transaction due diligence. Upon signing the Purchase Agreement, XCL and Verdun asked for, and received, competitively sensitive information about EP's business operations and customers in Utah and Texas. This

information included details on EP's customer contracts, customer pricing, production volumes, customer dispatches, business plans, site designs, vendor relationships and contracts, permitting and surveying information, and other competitively sensitive, nonpublic information. EP provided some of this information to XCL and Verdun on a daily or weekly basis.

60.     EP took no meaningful steps to resist these requests from XCL and Verdun. Instead, EP agreed to provide XCL and Verdun employees with access to its competitively sensitive information in the pre-merger period, even though EP competed directly with both XCL and Verdun and the information exchange lacked any legitimate business purposes. Further, EP made no effort – and XCL and Verdun offered no protections on its own – to limit the access to, or use of, EP's competitively sensitive information by XCL's and Verdun's employees.

61.     In the days following execution of the Purchase Agreement, XCL and Verdun requested and received access to EP daily operating reports, including reports on EP's crude production, dispatches by customers, and oil sales and loads by counterparty. These materials were provided to several XCL and Verdun businesspeople responsible for sales, marketing, and operations.

62.     These daily reports provided the employees of XCL and Verdun with virtually real-time information about EP's operations, output, and sales. To illustrate, in an August 4, 2021, email from EP's Chief Operating Officer to a number of XCL and Verdun employees – including the CEO and head of operations for both XCL and Verdun – the EP executive writes, "You will start receiving the attached Operations Report daily. This report covers drilling, completions, workovers and production."

63.     XCL also requested and received weekly updates on EP's permits and sundries, spacing orders, and ongoing regulatory work, as well as access to EP's site survey logs, geologic reports, geosteering reports, software communication systems, and various other datasets.

64.     Beyond regular reports and updates, XCL and Verdun employees requested and received information on an ad hoc basis on EP's development plans, contracts, customers, projections, deliveries, and seemingly any other aspect of EP's business or operations of interest to XCL and Verdun business employees.

65.     The Defendants had no legitimate business purposes for exchanging and disseminating EP's competitively sensitive business information in the pre-merger period and failed to place limits as to who at XCL and Verdun could access the information or how that information could be used.

66.     Even information provided by EP to XCL and Verdun through the virtual data room – ostensibly for the legitimate purpose of conducting due diligence on the proposed transaction – lacked appropriate safeguards on access and use.

67.     Some of EP's confidential information from the due diligence data room was used by Verdun's operations and sales employees to inform pricing and contract terms in the pre-merger period when Verdun and EP were still competitors in the marketplace. As noted in Paragraph 58 of this complaint, a Verdun employee used information from the virtual data room to discuss with his counterpart at EP prices for EP's customers.

68.     The information flow from EP to XCL and Verdun continued in full force through approximately October 2021.

CAUSE OF ACTION

VIOLATION OF SECTION 7A OF THE CLAYTON ACT

69. Plaintiff alleges and incorporates paragraphs 1 through 68 as if set forth fully herein.

70. XCL and Verdun's acquisition of EP was subject to Section 7A premerger notification and waiting-period requirements.

71. XCL and Verdun substituted their business interests and judgment for those of EP and exercised operational control over key aspects of EP's business before expiration of the waiting period in violation of Section 7A.

72. By controlling EP's business operations after having agreed to acquire EP, XCL and Verdun acquired beneficial ownership of EP's assets and thus acquired and held those assets within the meaning of Section 7A.

73. The Defendants were continuously in violation of the requirements of the HSR Act each day beginning on July 26, 2021, until XCL and Verdun ceased exercising operational control over relevant aspects of EP's business and the Purchase Agreement was amended on October 27, 2021.

REQUEST FOR RELIEF

Wherefore, the United States requests:

(a) that the Court adjudge and decree that each Defendant violated the HSR Act and was in violation during the period beginning on July 26, 2021, and ending on October 27, 2021, a total of 94 days;

(b) that the Court order the Defendants pay to the United States an appropriate civil penalty as provided under Section 7A(g)(1) of the Clayton Act, 15 U.S.C. § 18a(g)(1), and 16 C.F.R. § 1.98(a);

(c) that the Defendants, their officers, directors, agents, employees, subsidiaries, and

successors, and all other persons acting or claiming to act on their behalf, be enjoined,

restrained, and prohibited for a period of ten years from, in any manner, directly or

indirectly, engaging in any other agreement, combination, or conspiracy that has the same

effect as the alleged violation;

(d) that the Court order such other and further relief as it may deem just and proper; and

(e) that the Court award the United States its costs of this suit.

Date: _____, 2025

FOR THE PLAINTIFF UNITED STATES OF AMERICA:


_____

Doha Mekki
Acting Assistant Attorney General
Department of Justice
Antitrust Division
Washington, D.C. 20530

Maribeth Petrizzi
D.C. Bar No. 435204
Special Attorney


_____
Jamie R. Towey
D.C. Bar No. 475969
Special Attorney


_____
Kenneth A. Libby
Special Attorney


_____
Paul Frangie
Special Attorney

Federal Trade Commission
Washington, D.C. 20580
(202) 326-2564