UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br><br>      Plaintiff,<br><br>   v.<br><br>**XCL RESOURCES HOLDINGS, LLC**, *et al.*<br><br>      Defendants. | Civil Action No. 25-cv-41 (TSC) |

**MEMORANDUM OPINION**

The United States initiated this action against Defendants XCL Resources Holdings, LLC ("XCL"), XCL's sister company, Verdun Oil Company II LLC ("Verdun"), and EP Energy LLC ("EP") for antitrust violations arising out of XCL and Verdun's acquisition of EP. The United States alleged that Defendants violated Section 7A of the Clayton Act, 15 U.S.C. § 18a, commonly known as the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"), by failing to abide by the HSR Act's premerger waiting period before XCL and Verdun began exercising operational control over key aspects of EP's business. Before the court is the United States' Unopposed Motion for Entry of Final Judgment ("U.S. Mot."), ECF No. 10. For the reasons below, the United States' Motion is GRANTED.

I.  BACKGROUND

A. Factual Background

XCL, Verdun, and EP are companies that develop, produce, and sell crude oil in the United States. Competitive Impact Statement ("CIS") at 3, ECF No. 3. XCL operates in the Uinta Basin of Utah, Verdun in the Eagle Ford area of Texas, and EP in both. *Id.* XCL and EP are two of the

four significant oil companies in Utah's Uinta Basin, and Verdun is under common management with XCL. *Id.*; Compl. ¶ 3, ECF No. 1. On July 26, 2021, XCL and Verdun agreed to acquire EP for approximately $1.4 billion. CIS at 3. This transaction was subject to the federal notification requirements imposed by the HSR Act. *See* 15 U.S.C. § 18a(a); Compl. ¶ 2. Accordingly, Defendants' parent entities filed their pre-acquisition Notification and Report forms with the Federal Trade Commission ("FTC"), as required. CIS at 3. After reviewing these forms, the FTC opened an investigation into the competitive effects of the proposed transaction. *Id.* It concluded that "if XCL reduced the volume of crude oil that it supplied to Salt Lake City, Salt Lake City area refiners would be forced to pay more for Uinta Basin waxy crude oil." *Id.* To address its concerns about this potential impact on market competition, the FTC obtained a consent agreement that required Defendants to divest all of EP's Utah operations to a third-party operator. *Id.*

Despite Defendants' compliance with the HSR Act's notification requirements, the Government alleges that Defendants failed to observe the required premerger waiting period, commonly known as a "gun-jumping" violation. Compl. ¶¶ 35–68. Specifically, under the Act, Defendants were to observe a mandatory waiting period before transferring beneficial ownership or operational control of EP's business to XCL and Verdun. *See* 15 U.S.C. § 18a (prohibiting persons from "acquir[ing], directly or indirectly, any voting securities or assets of any other person" exceeding certain thresholds until the expiration of the mandated waiting period). This waiting period requirement is designed "to facilitate Government identification of mergers and acquisitions likely to violate federal antitrust laws before the proposed deals are consummated." *Pharm. Rsch. & Mfrs. of Am. v. FTC*, 790 F.3d 198, 199 (D.C. Cir. 2015). According to the Government's Complaint, Defendants' waiting period obligation began on July 26, 2021, and lasted through March 25, 2022, when the FTC entered the consent agreement. Compl. ¶ 5.

The United States claims that instead of observing this mandatory premerger waiting period, XCL and Verdun allegedly began exercising immediate operational control over key portions of EP's business activities pursuant to the executed terms of the July 2021 Purchase Agreement, which transferred approval rights over EP's ongoing and planned crude oil development and production operations, as well as many of EP's ordinary-course expenditures, to XCL and Verdun. Compl. ¶¶ 7, 35. For instance, according to the Complaint, XCL required EP to immediately halt its new well-drilling activities so that XCL "could take over the management of EP's development plans and designs moving forward." *Id*. ¶ 36. XCL and EP allegedly coordinated on EP's customer contracts, relationships, and deliveries, *id.* ¶¶ 43–51, while Verdun and EP coordinated prices for EP's customers in the Eagle Ford region, *id.* ¶¶ 57–58. The Complaint also alleges that EP needed to secure XCL's or Verdun's approval before making expenditures above $250,000, conducting basic activities such as hiring field-level employees and contractors, making any changes to EP's well-drilling and site design plans, modifying areas where EP could pursue leasing and renewal activities, instituting changes regarding EP's selection of vendors, and other "ordinary-course activities needed to conduct its business." *Id.* ¶¶ 52–56. In addition to these constraints, EP also allegedly exchanged competitively sensitive information with XCL and Verdun, at their request, on a daily or weekly basis without adequate safeguards to "limit access of prevent misuse." *Id.* ¶¶ 59–68.

According to the Government, this transfer of operational control over EP's business to XCL and Verdun amounted to a transfer of beneficial ownership such that "Defendants were continuously in violation of the requirements of the HSR Act each day beginning on July 26, 2021, until XCL and Verdun ceased exercising operational control over relevant aspects of EP's

business" pursuant to Defendants' amendments to the Purchase Agreement, which essentially returned operating control over EP's well-drilling and planning activities to EP. *Id.* ¶ 73.

## B. Procedural Background

On January 7, 2025, the United States initiated this action against Defendants for failing to adhere to the HSR Act's premerger waiting period before XCL and Verdun began exercising operational control over key aspects of EP's business. Compl. ¶¶ 70–73. On the same day, the United States filed a Proposed Final Judgment, ECF No. 4-1, and Stipulation, ECF No. 4, signed by both parties and consenting to entry of the Proposed Final Judgment after compliance with the requirements of the Tunney Act, 15 U.S.C. § 16. Under the proposed Final Judgment, Defendants must pay civil penalties totaling $5,684,377 within 30 days of entry of the Final Judgment. *See* Proposed Final Judgment at 4–5. The proposed Final Judgment also prohibits Defendants from engaging in specified conduct designed to prevent future violations of the HSR Act and imposes compliance and compliance-reporting obligations. *Id.* at 5–11.

The United States also filed a Competitive Impact Statement ("CIS"), describing the transaction and the proposed Final Judgment, *see* CIS at 3–14, and then published the Complaint, Proposed Final Judgment, and CIS in the Federal Register, initiating a sixty-day public comment period, *see* United States of America v. XCL Resources Holdings, LLC, Verdun Oil Company II, LLC, and EP Energy LLC; Proposed Final Judgment and Competitive Impact Statement, 90 Fed. Reg. 7159 (Jan. 21, 2025). During the comment period, the Government received a single response from Oscar Cifientes Lopez, a member of the public, but the Government declined to modify its proposed Final Judgment. *See* Resp. of the United States to Public Comment at 9–10 ("U.S. Resp."), ECF No. 9. At the close of the comment period, the United States filed an Unopposed Motion for Entry of Final Judgment, U.S. Mot. at 1-6, with an attached Certification of Compliance with the Tunney Act's requirements, Cert. of Compliance at 1–3, ECF No. 10-1.

## II. LEGAL STANDARD

The Tunney Act requires courts, "[b]efore entering any consent judgment proposed by the United States," to "determine that the entry of such judgment is in the public interest." 15 U.S.C. § 16(e)(1). In making this determination, a court shall consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

*Id*. While the Government enjoys "broad discretion to settle with the defendant within the reaches of the public interest" and courts must be "deferential to the government's predictions as to the effect of the proposed remedies," courts must still "make an independent determination" as to the public interest and may not simply "rubber stamp[]" the Government's proposal. *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458, 1461 (D.C. Cir. 1995) (per curiam) (cleaned up). The "relevant inquiry" is therefore "whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable." *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15–16 (D.D.C. 2007).

## III. ANALYSIS

### A. The Public Interest Inquiry

Upon review of the record, the court finds that the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). Specifically, the court finds that "the clarity of the proposed Final Judgment, the sufficiency of its enforcement mechanisms, and the competitive impact on

third parties" warrant such a conclusion. *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 151 (D.D.C. 2016); *see also Microsoft*, 56 F.3d at 1458–62.

### i. Clarity and Precision

"A 'district judge who must preside over the implementation of the decree is certainly entitled to insist on that degree of precision concerning the resolution of known issues as to make his task, in resolving subsequent disputes, reasonably manageable.'" *Iron Mountain*, 217 F. Supp. 3d at 151 (quoting *Microsoft*, 56 F.3d at 1461–62). The court is satisfied that the proposed Final Judgment offers sufficient specificity and reasonable detail for the court to adjudicate and enforce its terms should subsequent disputes arise.

The proposed Final Judgment offers a straightforward application of civil penalties in that it requires XCL and Verdun jointly and severally to pay a civil penalty in the amount of $2,842,188.50 and EP to pay a civil penalty in the same amount, all within 30 days of entry of the Final Judgment. *See* Proposed Final Judgment at 4–5. In addition, Defendants are prohibited from engaging in certain anti-competitive conduct during the "Pre-consummation Period" of any future transaction subject to 15 U.S.C. § 18a's requirements, including (1) transferring "any operational or decision-making control over any aspect of the business, assets, or interests that are part of the Reportable Transaction," (2) requiring "one party to the Reportable Transaction to obtain approval from another party of the Reportable Transaction for any ordinary-course business activities or expenses," (3) delaying or suspending "ordinary-course sales or development efforts," or (4) disclosing or seeking to disclose certain "information for any Competing Product," with enumerated exceptions. *Id.* 5–6. These prohibitions are accompanied by a list of examples of permissible activities. *Id.* at 7. The proposal also lays out various specific requirements detailing Defendants' obligations to "design, maintain, and operate" a compliance program to ensure

conformity with the Final Judgment and applicable antitrust laws, as well as to certify observance of these compliance provisions to the United States within 60 days of entry of the Final Judgment. *Id.* at 7–9. Lastly, the proposal provides a ten-year expiration date for the above conditions following the court's entry of final judgment. *Id.* at 13.

In light of these clear mandates, "the court is satisfied that the Final Judgment reflects the degree of precision necessary for the court to resolve any subsequent disputes that might arise concerning the Final Judgment's implementation." *Iron Mountain*, 217 F. Supp. 3d at 151 (cleaned up).

### ii.   Compliance Measures

The proposed Final Judgment also "contains sufficient enforcement mechanisms to ensure that its remedies are implemented." *Id.* For instance, Section VII sets up an affirmative compliance program, including requiring each Defendant to appoint a "qualified antitrust compliance officer" to "supervise the design, maintenance, and operation of the [compliance] program." Proposed Final Judgment at 7. The compliance officer is also required to annually certify to the United States that the Defendant who appointed them is complying with the Final Judgment and to report any violations. *Id.* at 9. As part of this compliance program, Defendants must distribute copies of the Final Judgment to future parties to any Reportable Transactions in addition to their own current and future officers, employees, and agents responsible for a list of enumerated business activities, who shall also be subject to reporting requirements, training requirements regarding the terms of the Final Judgment and federal antitrust laws, as well as an annual certification requirement that they understand their obligations under the Final Judgment and agree to abide by its terms. *Id.* at 8–9.

In addition to these internal checks, Section VIII lays out Defendants' obligations regarding the Government's compliance inspections. The proposal grants the Department of Justice access to Defendants' records and documents relating to matters contained in the Final Judgment, access to personnel for interviews or depositions regarding such matters, and requires production of written reports upon the Government's request. *Id.* at 10. The proposal also reserves the Government's right to enforce the terms of the proposed Final Judgment through future enforcement proceedings, including seeking an order of contempt from this court. *Id.* at 11. Given these various safeguards, as well as the court's retained jurisdiction to modify and enforce any provisions or issue further orders and directions as may be "necessary or appropriate" upon request of any parties, *id.* at 11, the court is satisfied that the proposed Final Judgment contains sufficient mechanisms to ensure future compliance. *See e.g.*, *United States v. Newpage Holdings Inc.*, No. 14-cv-2216, 2015 WL 9982691, at *6 (finding similar compliance mechanisms adequate); *SBC Commc'ns,* 489 F. Supp. 2d at 24 (same).

### iii. Competitive Impacts

In terms of the proposed Final Judgment's efficacy in alleviating the alleged competitive harms, the record reasonably supports the United States' conclusion that "[t]he relief required by the proposed Final Judgment will prevent future violations of Section 7A of the Clayton Act of the type Defendants committed and secures a monetary civil penalty for XCL's, Verdun's, and EP's violation of Section 7A." CIS at 6. Specifically, the measures described above appear reasonably tailored to the alleged violations so as to prevent reoccurrence. For instance, the specified prohibited conduct essentially mirrors Defendants' prior activities alleged to have violated the HSR Act. *Compare* Compl. at 11–18, *with* Proposed Final Judgment at 5–6.

Additionally, while the court notes that the $5,684,377 civil penalty is less than the maximum civil penalty permitted under the HSR Act, *see* 15 U.S.C. § 18a(g)(1); 16 C.F.R. § 1.98(a) (setting annual inflation adjustments for civil monetary penalties within the FTC's jurisdiction), the court concurs with the agency's conclusion that such an amount is reasonably calculated in light of, *inter alia*, Defendants' willingness to resolve the matter by consent decree, thereby saving significant federal time and resources by avoiding a prolonged investigation and litigation.  *See* CIS at 8; *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 80 (D.D.C. 2014) (determining that the public benefit of entering a consent agreement outweighed the benefit of having a trial due to the uncertain outcome and cost of an antitrust trial).  The court also defers to the Government's prediction that this penalty will "deter future instances in which parties seek to immediately acquire control of an independent competitive presence before filing the required pre-acquisition notifications with the agencies and observing the required waiting period." *Id.*; *Newpage Holdings Inc.*, 2015 WL 9982691, at *7 (explaining that courts "defer to the United States' predictions regarding the effect of its proposed remedies"); *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case").

Finally, as set forth above, the compliance measures establish sufficient governmental oversight to ensure future compliance not only with the terms of the Final Judgment, but also with other federal antitrust laws.  *See Microsoft,* 56 F.3d at 1462 (explaining that, in determining the competitive impact of a settlement agreement, a district court must "pay close attention to the compliance mechanisms in a consent decree").

    iv.    **Public Comment**

As noted above, the Government received a single comment during the Tunney Act's 60-day public comment period. That comment, submitted by a member of the public, inquired (1) whether the Defendant companies were publicly traded and, if so, whether the conduct alleged in the Complaint affected the pricing of stock transactions, and (2) whether civil penalties would address the harm, if any, to consumers potentially paying more at the gas pump. U.S. Resp. at 9. The Government did not make any changes to the proposed Final Judgment in response to that comment on the grounds that "[t]he Defendants were not publicly traded companies, the Complaint does not allege harm to consumers or public markets, and the civil penalties are imposed to address the HSR violation alleged." *Id*. The court finds that the Government's position is sufficiently supported. Though the comment raised justifiable concerns, the court's role is limited to "evaluating whether the Proposed Final Judgment[] provides a reasonably adequate remedy for the harms alleged in the Complaint." *Newpage Holdings*, 2015 WL 9982691, at *7 (citation omitted). Here, the United States has provided "a sufficient factual basis that its proposed remedies"—civil penalties, prohibitions on future violations of Section 7(A), and requirements regarding enforcement and compliance mechanisms—are "adequate to remedy the alleged harms"—failure to abide by the HSR Act's mandated waiting period. *Iron Mountain*, 217 F. Supp. 3d at 153.

Upon consideration of the requisite statutory factors, *see* 15 U.S.C. § 16(e)(1), the court finds that the relief contained in the proposed Final Judgment will benefit competition for the reasons detailed above, as well as in the CIS, and because compliance with the HSR Act's premerger waiting period facilitates the identification and prevention of antitrust violations before they occur.

## IV.     CONCLUSION

In light of the foregoing, the court concludes that the United States has complied with the requirements of the Tunney Act and that entry of the proposed Final Judgment is in the public interest. Accordingly, the court GRANTS the United States' Motion for Entry of Final Judgment. The Final Judgment will issue separately.

Date: February 4, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge